I don't worry about the buzzers that come, I worry about whether the judges are going to give me the hook of incident. My name is Gary Laughlin and I'm here on behalf of Systems West. This is a case that involves competing interests under the Labor Management Relations Act. We're primarily here because of free speech during a union organizing campaign, the employer's right to free speech. That right to free speech is guaranteed under 8C of the Act. It is a right that is co-equal and co-extensive with the rights under Section 7. Employees' rights to form, join, and assist a union or not do that. Co-equal. And this circuit has said the NLRB can't constrict that right of free speech. And the tensions we're having here today come from the decision of the administrative law judge and the board finding the employer violated Section 881 of the Act, interfered with the employee's rights to organize through threats, promises, things of that nature, primarily threats. And the decision of the board upholding that. Now, the question becomes, the board is in cases referred to as sort of the expert. And why wouldn't the court defer to that? Because they have the expertise in that. Well, the problem is that there is a right of appeal because boards and administrative agencies, just like judges, none of the district judges here on the bench, just like some judges make mistakes. Right. If you can ever get there. And we look at the standards that they have to have substantial evidence. And when you look at the underlying decision and you start looking at what's required and what the board did of just affirming it without even discussing these issues, you start wondering what's going on. For example, if I may, the administrative law judge found that there was an unfair labor practice, a violation of 881, because a supervisor asked another employee, asked an employee, what's going on with the union? Now, the NLRB says that simply asking the question in and of itself is not a violation of the act. The Ross Morehouse case says you have to look at the overall circumstances to determine what happened. And the judge says that's the only thing that was in the record that he asked the question. There was no evidence of background, situations, circumstances. It was not there. And the judge said maybe it was an innocuous questioning, but I'm still going to find it a violation. Now, the burdens on general counsel to prove the violations, and if they don't establish the circumstances, how can there be a violation? Let me ask you, there's a lot of claim violations here, and you can either look at them by physical location, whether it's in Oregon or Ocala, or you can look at them by subject matter, I guess, if you will. I've tried to look at them both ways. What if we were to determine that the board was correct, but not 100% correct, in other words, that some of these statements did not run afoul and were not interference or restraint or coercive in nature, but the bulk of them were? What would be the result? I believe it would be remand to the board to make a determination of whether that was sufficient to require a new election, because the board did not articulate specifically the reasons for the new election. There were two issues. One, were there 81 violations, and two, were they sufficient to have a new election? The other thing they did, when they're making decisions without evidence in the record, was the case of the president in his office with an employee by the name of Hanson. The employee came to the office and volunteered. Hanson had been laid off. The union, along with about eight other employees, the union immediately filed unfair labor practice charges, which were ultimately found to have no basis. It was simply a seasonal business layoff. Hanson came in and voluntarily told the president, I wasn't laid off because I was a union supporter. I was laid off because of business. And Greene says, what did the union do to lead you to be a part of the charge? And that's only evidence. And they find a violation when he comes in. How is that a violation? Where is that a threat? Where is that intimidation? It's a natural question that happens. What else does the board do? Two supervisors and a fellow are talking. They're talking about what happens if the union comes in and the wages. And the board finds, the ALJ finds, and the board doesn't address it, that it finds this a violation. But supervisors are not a part of the act. They can talk about what they want. They can say what they want. And how did they do that? They said the one guy was a superintendent. The other was a supervisor. When the superintendent comes to the job site, the other guy stops being a supervisor. And the board cases don't say that. That's a big stretch. A big stretch with what they're talking about. And then with Bentecourt in IOM, they find a violation because he threatened closure. But what did Bentecourt do? He said, I don't speak English well. I may not be able to express myself. Doesn't bother the judge. Doesn't bother the board. And what did he say? It's quoted. He says to the employees, and they live together, eat together, work together, and speak Spanish on the job. He says, I'm supporting the union too. If you're going to be union, I'm going to be union. We're all going to be union together. And maybe we won't work for a while. Maybe it will affect those who speak English better than us. I don't know. And that's a violation. Now, where's the threat? If he says, I want to be union too. He's supporting that. How does that get to be a threat? Was that different as a threat or a prediction? I just characterized that as a threat of closure. Threat of plant closure. Well, I guess they thought that this was kind of a failed threat by throwing that maybe we won't work. And then these people are going, okay, you know something we don't know. If we work at this union, we're not going to have a job. But there was no evidence of anything surrounding those circumstances, other than Van't Hort's testimony. And his testimony was, I may not be able to express myself adequately because I don't speak English well. And I supported the union. I'm with you. Maybe everybody, including me, may be out for a while. Maybe it will be good. Maybe it will be bad. How do we realistically get to a threat? The ALJ does it by saying that the company president, I've concluded that an almost identical threat uttered by David Green to respond to employees at its Magic Metal shop site was unlawful. He says it's basically tracking the same thing. Now, it may be that Van't Hort's talking independently and expressing his own concerns and whatnot. But the ALJ concludes that, gee, the same thing is being said by the company president. From that, I take it he infers that it's not unconnected. That's what he says. But the ALJ was rather light in his analysis because there's a difference between what Van't Hort said and what the president, David Green, said. And the threats, the threats of plant closure that they're talking about has to be, is a prediction, is what they're talking about. And what they're talking about is the union passed out to all employees a handout stating what the union wages were going to be. They gave it to all the employees. It said they were going to be about $30 an hour. Now, what did Green do in this meeting that he founded? He said, if we have to pay the union wages, the union wages that they're talking about, $30 an hour, which Systems West was paying about $9 to $10 an hour, if we have to pay that $30 an hour and we're working in the agricultural market that is in tough times right now, we're not going to be able to compete without the non-union employers. Now, that's what he said. Now, that's what Dave Randall said up in Othello to the other supervisor. He said, if we have, if, not that we will, if we have to pay the union wages, we will have to increase our margins 25% and the competition will eat us alive. And that's what Dave Randall said, not Dave Randall, Ravine. Ravine said the same sort of thing. Well, he said, he said, well, I don't think we would pay these extra costs to take them out of the job site. Different threat. Different threat. Okay, so there's so many threats here that it's hard to keep from us. Well, they're not threats. They're statements. They're statements. Please, bear with me, at least on my side. You can call them threats on his. Well, and that's what they, they were characterized by that as both by the AHA and the board. If you're supposed to have a reasonable, informal basis for what you say, what do you think is going to happen in any business? I don't care who it is. If you have to pay three times the amount for wages and benefits, it's going to affect your ability to compete. I don't care if it's a union of company. If they triple their wage costs, their labor costs, how do you compete? Now, look at, look at village nine, the decision. And in my, the appendix to my brief, the type of things. It's an informal prediction based upon fact, which they told them. Now, some of the other things they talk about, and I'll say them. A lot of them are Dave Ravine or Mr. Ravine in Iowa, Oregon. What did he tell them? He said, you're going to, you'll be hired out of the union hall. They're saying this is a threat. They're saying that you won't be journeymen. He denigrated them and said you're not going to be journeymen. And how are you going to be dispatched? You're supposed to look at the overall circumstances. He met with the employees and said, I want you to ask questions. I want you to go to the union meetings. I want you to find out. Do you know what you're going to be paid? Do you know whether you're going to follow the work? And the employees didn't know. So what did he say? He had experience with three unions. He said, you're dispatched out of a hiring hall at the site of work. And what did the administrative logic say during the hearing? He said, on the record, that's the common way people view unions work. If you move the work from Seattle to Yakima, where I live, there's a union hiring hall. You ask for people there. And guess what? The union contract actually says that. You shall, mandatory, you shall first request dispatch from the local hall. And there's a map showing all those. Now, the protections of 8C, according to the TRW case, protects speech. Even if it is wrong. Even if the employer's predictions and statement is wrong, the answer for the union is to go back there and correct it. Now, what did the judge say? He said that the union had portability. Employees could follow the work. What evidence did the judge use? A statement from the union representative who was participating in the hearing, which was not under oath in a colloquy between counsel and the union representative. It's not under oath. It's not evidence. There's no evidence of portability. And the union representative who testified said the fact that when you read the contract, the fact that you have to go to the local halls is a reasonable interpretation from reading it. So how does that take it to be a threat? And when you're talking about wages, he says, find out what wages you're going to get. Is that a different statement? Find out what you're going to get from you won't get union wages? He never said you won't get union wages. The ALJ short circuits and concludes but doesn't look at the exact language. He never said you will not get it. He never said you are not good enough to get it. He said find out. What he said was if we are forced to pay the union journeyman wages, we would have to go to the union hall and get experienced journeymen. Now, doesn't that make sense? Look at these employees. These are employees who work erecting steel buildings. They bolt them together, these pre-made, pre-assembled steel buildings. This is the carpenters' union. Carpenters use hammers, saws, measures, things like that. What makes you think that a person who bolts buildings together is going to become a journeyman carpenter and be able to be called out on a complicated, difficult job? It doesn't make sense. Ask the union and think about it. Well, I'm from that point where he's basically saying, well, if I have to pay journeyman wages, then of course you'd want a journeyman to show up at your job. I mean, I'm paraphrasing the question. Yes. But I think, if I understand your point, is that that is not a threat, but more along the lines of something that's an objective fact of how they do business. It's common sense. Why are you going to pay more money than you have to? And shouldn't the employees know that? Because don't forget, the Supreme Court, in the Wynn v. Plantegard case in the Ninth Circuit, has said, we expect a vigorous debate. It's not necessarily going to be pleasant. It's not necessarily going to be fair. It may invoke fear, but that's part of it. That's the only way employees can learn what's going on and make an informed choice. And what the ALJ did, what the NLRB did, and what General Counsel here today wants you to do, is not let people have that informed choice. How do they do that? Everybody's going to be a journeyman. Everybody's going to get this $30 an hour that they did, and we're not allowed to talk about it. Why? The union put that sheet out, that you're going to get $30 an hour as a part of the sales pitch, that come join us because that's what you're going to get. That's the implication. Now, would they like everybody to have that implication because you join the union, you're going to get it? Yeah. One of the representatives said, nobody has to sign the area agreement. Some people sign others. Do they tell the employees that? No. Does the NLRB fault them then? No. Do they fault the employer for saying, it's not going to happen the way the union says, go ask them? Yeah. Why? Because they don't want the employer to have the right of free speech. They want to constrain that. And as I cited in my reply brief, the history of the Wagner Act and the Taft-Hartley Act, the Wagner Act initially, and the NLRB ruled, that there were great constraints on employers' ability to speak at all during union organizing grounds. The amendments in the Taft-Hartley Act were added to give the employer the right to free speech in 8C. The Supreme Court recognized that, to broaden that so they can have the choice because what this is is a vigorous debate. Now, when you look at each and every one of these that the NLRB found and the judge found, and I'm running out of time quickly, but if you look at those, and I addressed each and every one, none of them constitutes a threat. And that's the issue, because the employer has the absolute right to free speech unless there's a threat. I kind of got the impression when I looked at this that the judge essentially took all of these and essentially said, well, maybe not this one, maybe not this one, it's very close, and cumulatively he casts a cloud over them all. I disagree with you. He found one case, one instance, one precedent. He threw them all together and he avoided the analysis that's required. If the analysis requires that a statement alone asking you, what do you think of the union, if the NLRB says that's not a violation, you have to look at the overall circumstances, and he doesn't look at the overall circumstances because there is no evidence. What's wrong? He hasn't done his job, and when he hasn't done his job that way, and the board just rubber stamps it. What I'm asking you is, is it your argument that what he did was he took all of these, what you would call isolated incidents, and then put them together or molded them together and called that the overall circumstance? I think he tended to look at everything together and find as a group they all existed without individual analysis, yes. In other words, I got the impression that he felt there was some kind of a surreptitious campaign, a mini-window and so forth going on by the employer, and that all of these kinds of veiled comments that didn't quite rise to the level of being an out-and-out threat, however you call the threats, nonetheless constituted a threat atmosphere. It wasn't a surreptitious campaign. No, I'm not suggesting that it was. I'm asking you whether it's your view that that's what the administrative law judge came to the conclusion. I think that's correct, and I think he took giant leaps to reach that. Thank you. Good morning, Your Honour. May it please the Court I'm Greg Murrow, counsel for the National Labor Relations Board, and I'm here to ask the Court to fully enforce the Board's order. I just want to point out at the outset that we believe the facts under the substantial evidence test support each of the Board's findings, that the company made various threats and statements that would tend to coerce regional employees and as such violated Section 8A1. In fact, the record shows the company engaged in a multi-state campaign of threats, interrogation, and misinformation to stop its employees from exercising their rights under the Act, and that when you look at the totality of the conduct, which is what the Supreme Court in this Court says you should do, you can see that the Board's findings are all well supported. Now, before we move on to some of the individual threats and statements that are... Before we do that, let me just make sure I have your point in mind, because even though there may be substantial evidence to support individual statements in terms of how they're characterized, what if some of the statements that are characterized in a certain way by the ALJ, what is the legal effect if we disagree with that characterization as a matter of law rather than on an evidentiary basis? As a matter of... If you think the Board... In other words, you're not talking about a situation where you think the Board misunderstood the record, but a situation where the facts were properly articulated, it just didn't rise to the legal level of an unlawful statement. Correct. If that's the case, it would depend. If you think the Board was so wrong that it made an error of law, then I think that part of the order would not be enforced. If, differently, what happened was the Board relied on a series of facts, and you think some of those facts weren't properly characterized, then the issue would be, is what you agree occurred enough to justify a violation? But I want to make sure I understood your question. But it would seem to me if there is... If a violation is completely based on an error of law, then I don't know what would be left to support. But now let's take the situation... Let's say that the statement made by the employer How's it going? Do you meet with the union today? Would that be... Do you think that would be characterized as a threat? It would depend. Not necessarily. The Board looks at the totality of the circumstances. Actually, it raises something I had to let the Court know about. In his discussion, my opposing counsel mentioned a couple of interrogations in an incident where the Board supposedly all of a sudden made someone a supervisor and no longer a supervisor. And that there was one interrogation where there was no evidence on the record to show the records of tenancy to coerce. I believe my counsel is talking about two interrogations that are not before the Court because the Court declined to address them. And when you look at page 1, footnote 1 of the Board's decision, it says, I'm not going to address these particular interrogations. I think one is Mr. Ravine supposedly interrogating an employee named Ibarra and another place where he supposedly interrogates an employee named Rosales. The Board said, because looking at this would be cumulative of the remedy, we've already found there are several other unlawful interrogations, we've already ordered the company to stop doing that, we're not going to address these as accumulative. And now opposing counsel is asking this Court to address and consider those findings even though they are not before the Court. They were not part of a final Board order and as such the Court doesn't have jurisdiction to address them. Well, Mr. Laughlin made reference to a number of different episodes. There's one, and I'm trying to remember, I think the employee's name might have been Hanson, talked about coming in and saying, I wasn't part of this, and the question from Mr. Green was supposed to be, well, how did it come to be the union got to be part of this? I take it that's not one of the episodes that you're suggesting the Board disregarded or set aside. No, that's right. Those are one of the interrogations the Board did address. And as to that interrogation, you have to look at all the facts. As noted, that employee had been recently laid off, went back to get his job back, and that's the conversation he initiated. Can I come back to work? He didn't initiate a conversation about the union and the charge. The credit evidence shows and the Board found Mr. Green did that. And in that context, you have a company president interrogating an unemployed person, coming back from work, a rather vulnerable position, interrogating him, how did the union lead you into this, handing him the charge and asking him what he thought. And in addition, Mr. Green admitted this was not an employee who was a known union adherent. And under those circumstances, an established case law, that amounts to a tendency to coerce and have all the factors for an unlawful interrogation there. For example, I certainly have a handle on this. So as you understand the evidence, Mr. Hansen came in, having been laid off previously, came in seeking to get his job back and the issue of the union organizing effort and I guess it was a grievance or some kind of unfair labor practice charge. That whole subject was brought into the conversation by Mr. Green, but Mr. Hansen had said nothing about it before Mr. Green initiated it. Well, that's what the Board found, and there certainly is no credited evidence that it was the other way around. That as my opposing counsel would have it, Hansen decided I'm going to go talk to the President about that charge this day. Rather, he went back to ask for his job back. My point only being that when you look at the interrogations at issue, there's a wealth of factual evidence showing a tendency to coerce under the traditional factors that the Board applies. And I think that's true for all of the Board's findings. But there are, if I may, Your Honors, a couple other points I'd like to jump to. As you know, we have a series of threats. Some of them, but not all of them, are alleged to be lawful predictions and just common sense statements. And I want to point out the Supreme Court has a test for that that this Court follows, and that is an employer is free to make predictions that choosing a union will have certain consequences, but only if that prediction is carefully phrased on the basis of objective fact to convey the employer's belief as the consequences beyond its control. And I think when we look at the facts here, the employer's statements flunked that test. And I think, for example, if you start with Ravine, Mr. Ravine, and his saying, you know, if you choose the union, you're not going to be able to work outside the local area anymore, a fairly serious implication, I would add, because most of the jobs were outside the local area at this time. The context is, he begins by unlawfully interrogating employees, or so the board found based on all the facts. He then said, you won't work outside the local area if you choose the union. In fact, I believe he suggested that that would be the union preventing them from working outside the local area. He ended by reminding employees, the company president and his supervisors don't like the union, we'll have to close our doors if we go union, and he counted off by saying, the union will probably force you into a work stoppage. That's the context of intent to coerce employees. But what's more, it flunked the Supreme Court's test, because as to all this alleged objective fact, he admitted, first of all, that he didn't rely on any document, including the contract my opposing counsel refers to, in making that prediction. And yet now the company, in its brief, and before you today, says that's the basis for objective fact. It's simply a post hoc. Secondly, Mr. Ravine. In the big picture, I've had trouble getting my arms around this, and the reason, I think, is that everybody seems to be talking about an unlikely hypothetical situation. You have here a company where the workers are assembling steel frame structures, getting paid, I think, what, $10, $12 an hour, something like that. And they could be organized as such. There probably is a steel frame structure union someplace. But as it happens, the organization effort here is being done by a union that represents journeyman carpenters. Now, that's not all that unusual, either. You've got service employees representing. That's just how it works. But injected into this discussion is, okay, let's pretend this is going to be treated like you are all journeyman carpenters. And so, as Mr. Laughlin argues, the union, he says, starts this because they're talking about, suddenly you guys aren't going to get paid $10 or $12 an hour. You're going to get paid $30 an hour. It doesn't take a rocket scientist to figure out that's not how this company works. And so the whole discussion after that seems to be off into this never-never land in terms of what's not going to happen. Instead of focusing on, okay, is there a benefit to be organized as a steel frame type union and as steel frame workers and you'll get paid steel frame worker wages as negotiated by the union and so forth. Now, at some level, I can understand management's reaction to say, well, we don't have to carefully calculate it. A business that pays $10 or $12 an hour isn't going to make it if we're now paying $30 an hour. And so the whole calculus seems kind of strange. It's not like it's going to take very calculation that the Supreme Court is trying to talk about to figure out that those two are entirely different animals. I appreciate your honest question. And, in fact, it goes to a series of overstatements and misstatements the company made, both Ravine and the company president Green, and I'd like to briefly address each of them and why none of them were supported by objective fact, common sense, or otherwise. First, we were talking about Mr. Ravine saying you're not going to work outside the area in the union contract. At the hearing, he admitted that a union agent had told him after his statement, you're wrong, we have a policy of total portability. It allows you to take your employees to travel with you on long local jobs. And at the hearing, the judge asked him, if that's the case, did you make any effort to correct your statement? Mr. Ravine said no. And the reason is telling. He said, I couldn't proceed choosing to pay those extra costs, which again puts it in the realm of a consequence within the company's control, which under Giselle is a very strong factor against it being a lawful prediction. Now as to another fact, could this company pay $30 an hour? There's no objective fact to support the company's claim that that's what the union was promising. And I think that goes so far today in a brief to make it sound like the union passed out a piece of paper to employees that says vote for us, we'll give you $30 an hour. But when you look at the one document the company relies on, it simply doesn't support that claim. That document, which I believe is an excerpt of Record 109, says we have a range of wages from $12 to $28 an hour. That applies to a rather large array of classifications. And there is not, as I recall, record evidence saying which of those classification systems that its employees would fall into, nor does the company cite record evidence of the union promising them they fit into any classification. What the record evidence shows, in fact, is Mr. Ravine said, guess what? You're not going to be journeymen. I think you're going to be on the lower end of that range. So, you know, isn't that almost certainly true? Well, the issue is not just whether it's true. The issue is whether it would tend to coerce and it's an overstatement that would tend to mislead in Supreme Court's work. See, here's the problem. If it's the truth, if you're sitting there from the company's standpoint, the damage they do, the damage they don't, if in fact they have to pay a higher end of the scale, I suppose you're going to get the most skilled labor for that, and they might not want to hire these people. That seems to make sense. If they're not going to, if it's not true that you'll get up to that scale, then the company ought to be able to say that as well. So the difficulty with what you're saying is that even if something is objectively true, you're saying, but it might tend to mislead them and therefore then it becomes a threat. I'm having trouble understanding that. Well, what I'm doing or attempting to do is apply the Supreme Court's test, which goes to what information, what objective fact, is there when the employer is talking to employees. Now, when I say it may be true. Well, let's take that. Let's take the one where they're in this highly competitive, low-margin agricultural environment, and the guy who runs the company and the supervisors know in their heads that if they have to pay significantly higher hourly wages, then they're going to be at a disadvantage with the competitors. Why can't they say that? The problem is they said a lot more than that here, and I'm talking about the misinformation. As I explained, this claim that the union was promising $30 was misinformation. The company built on that by jumping from that misinformation and assumption to the further threat that it would lead to job closure and ignored the fact that the record shows the union often bargains. You don't have to pay the published wage rate. The union would often bargain to a lower level. So what you have here, in a way, is the worst kind of misrepresentation because the purpose of the act is to encourage bargaining, and the employer is intimating that bargaining is just not going to happen. That's what troubles me here. Let me go back to how this gets injected because I think we understand what actually would have happened. In fact, it would have played out in such a fashion because this company doesn't need journeyman carpenters at $30 an hour to assemble these steel frame structures, and so you'd wind up negotiating something different. But we're in an organizing stage here, and so the company's concern or the argument we heard this morning is that the union's injected this high number, this notion that, hey, we have contracts going up to $30 an hour, and there's no reason for the union to say that to the employees unless they're trying to generate some aspirations of sign up with the union. We're going to get paid a lot more. And so the company thinks it's simply responding to the issue that's been injected into this discussion by the union. But we should be specific about what was said and whether it was based on objective facts. Right, and we did interrupt your train of thought. No, no, no. So start down that path. What I'm saying is what the union injected into this debate is a wage sheet that said, in other territories, because this was attached to an expired contract from another territory, I believe. In other territories, this is what we have. This is our starting point for bargaining. This is what we try and get, and it's a range of $12 to $28. Now, the company then pounces on that and misstates it, and that misstatement's not objective fact. It says, oh, look, they're promising you $30. That's what the union's doing, and the implication is those kind of unreasonable wage demands are not going to help you out. We can't give it to you, or perhaps, in Ravine's case, they'll have to enforce their unreasonable demands with a work stoppage. And this court has held that an employer's baseless, unsupported warning that unionization means inevitably unreasonable wage demands and possibly strikes to enforce them is a threat under Gissel. It was not supported by fact, and I believe that's what we have here. So I just want to be careful about what the union injected into the situation. It injected the fact that it had this range. The company injected the misinformation that that range was just $30 and ignored the fact that there would be bargaining if things played out the way they're supposed to. And I would also point out that the context doesn't help the company here. I know we're looking at what can the company do to lawfully respond. Well, besides avoiding the overstatements I just discussed, it could, frankly, avoid the pattern of prior threats it's already engaged in, because, frankly, by the time you've threatened employees once or twice, and let's remember in Greene's case when he was talking about the $30 that he's already on his second threat of closure that day, once you engage in that, you're really priming employees to feel coerced by the next statement. And I think the company could have avoided that as well. I don't think they're put in an unreasonable position by the board's findings. In fact, that's what Judge Ezra was asking earlier about how much of this is based episode by episode and how much of it is the whole set. I take it you're saying that they, in fact, do feed on each other, that it's a pattern of threats so that even if it's the case in a later episode that, not that the evidence isn't compelling, but some of the pieces might not be fit into the puzzle entirely, given that the puzzle's outline has been sketched already, it's not hard to figure out or to reach the conclusion as to what's going on. I agree, and I do think it's common sense. This Court has taken a look at the totality of the circumstance. And common sense is, again, when you've been threatened several times in the heat of a union campaign and you know your job might be on the line, you do, as the Supreme Court said, have a tendency to pick up implications that might be dismissed by a more disinterested ear. So I think that's true. And I also – we haven't discussed all of the issues, and I don't want to short-circuit anything if Your Honors have questions, but I just want to submit that I think all of the other findings, the interrogations that actually are at issue, are supported by substantial evidence. As are the company's admission that it barred its employees from engaging in protected activity and wearing union insignia and essentially threatened to fire them if they didn't comply. They created the impression of surveillance. They made numerous other unlawful threats that they don't even claim are supported by fact or can't reasonably claim are. As I said, Green had an earlier threat, we'll have to close our doors because our biggest client will cancel their contract. The Board reasonably explained that there was no factual basis for that. And again, in light of all of those circumstances, I think the Board reasonably found a series of 8A1 violations. And even if there were some doubt, under the substantial evidence test, the Board's findings should be affirmed as reasonable. And unless there are more questions, I thank the Court for its time. Thank you. One of the problems that the ALJ Board and Council have is that they use catchwords and generalizations and don't get to specifics. You can't have this overall view that you mentioned unless you have each of the specifics having been found. If you don't look at the specifics and find and do it correctly, you don't have the violation. How does a sheet that's passed out that says $12 to $28 turn into $30? Well, you're adding benefits to it, which are there. And the wage rates start at $12 to $28. Apprentices start at $12. Journeymen are all around $25 to $27. Excuse me, $20 to $27 an hour plus benefits. That's how it gets there. If the union... There's no talk about maybe the union needs to be truthful about what it can do. It never talks about what's going on. That would be a set of proceedings, though, wouldn't it? They never do that because the union's allowed to make representations, and we get to counter. If we make false representations, they can counter. That's what TRW says, that 8C protects speech. Why else does the union pass this out, and only this, that says these are the wage rates that are effective through May 31st in counties covered, including Yakima, Kittitas, and everywhere? Why else do they pass this out unless that's what they want the employees to believe they're going to get? It's salesmanship. That's all this is about. And the company comes back and says, Look, if we had to pay those, if, underscore if, we can't function in this competitive environment. Go back and read Village 9, talking about a restaurant in which the owner says, Look, if we have to pay union wages, we're not going to be able to compete. If is not a violation. Common sense is not a violation. Now, what I'm trying to say is look at the facts. Counsel said that it was Dave Green who talked to Hanson and said, Why did you do this? If you look on the record, Excerpt 67, Green's the only one who testified. So the question was, he came into the office after he had asked for blank, blank. When he asked whether or not there was work, you asked him how the union had led him into the ULP charge that had been filed. Correct? Answer, I don't believe so. I asked him how the union had what led him to the NLRB charge. No, there was no conversation. He said that he was a part of that and he had requested to be taken off that, meaning the list. Green didn't inquire. And that's the problem. Generalizations, catch words, do not satisfy the specific inquiry that's necessary. And that's how they're missing. And that's what they're lacking. Thank you. Thank you. Thanks to both counsel for your argument and your briefs. The case of Systems West versus the NLRB is submitted. And we will officially adjourn the court at this point.
judges: McKeown, Clifton, Ezra